## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CARLOS LABRADOR,<br><br>                          **Plaintiff,**<br><br>                    **v.**<br><br>**NANCY A. BERRYHILL, Acting**<br>**Commissioner of Social Security,**<br><br>                          **Defendant.** | Civ. No. 18-9195-KM<br><br>**OPINION** |

### KEVIN MCNULTY, U.S.D.J.:

Plaintiff Carlos Labrador brings this action pursuant to 42 U.S.C. § 1383(c)(3) to review a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381. Labrador seeks to reverse the finding of the Administrative Law Judge ("ALJ") that he did not meet the Social Security Act's definition of disabled since October 24, 2014, the date Labrador filed his application.

The issue presented is whether the ALJ's decision is supported by substantial evidence. Specifically, Labrador contends that the ALJ (1) failed to consider the combined effect of his impairments; (2) did not conduct "a full" residual functional capacity ("RFC") assessment; and (3) improperly weighed the medical opinions in the record.

For the reasons stated below, the decision of the ALJ is affirmed.

## I.    Background[1]

On October 24, 2014, Labrador filed an application for SSI under Title XVI of the Social Security Act asserting that his disability, arthritis, began on October 25, 2013. (R. 156-62). His application was initially denied on December 17, 2014, and upon reconsideration on May 28, 2015. (R. 61-75).

On April 25, 2017, Labrador, represented by an attorney, appeared before the ALJ. (R. 18). The ALJ heard testimony from Labrador and Margaret Heck, a vocational expert ("VE"). (R. 18, 36-60). After the hearing, Labrador submitted additional evidence, which the ALJ considered before rendering his decision. (R. 18).

On June 7, 2017, the ALJ issued a decision finding that Labrador was not disabled within the meaning of the Social Security Act. (R. 18-27). The ALJ determined that Labrador's impairments, cervical and lumbar degenerative disc disease, right shoulder tendinopathy and labrum tear, and depression were severe, but not of listing-level severity. (R. 20-23). The ALJ concluded that Labrador, given his RFC, was able to perform work existing in the national economy. (R. 23-27).

## II.    Standard

To qualify for SSI, a claimant must meet income and resource limitations, and show that "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42

---

[1]    Citations to the record are abbreviated as follows:

"DE"   =    Docket entry in this case;

"R. _" =    Administrative Record (DE 9) (The cited page numbers correspond to the number found in the bottom right corner of the page for all DE 9 attachments);

"PBr" =    Plaintiff Labrador's brief (DE 13);

"DBr" =    Defendant's brief (DE 14).

"Reply" =    Labrador's reply (15).

U.S.C. § 1383c(a)(3)(A). A person is deemed unable to engage in substantial gainful activity

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 1382c(a)(3)(B).

### A. The Five-Step Process and This Court's Standard of Review

Under the authority of the Social Security Act, the Administration has established a five-step evaluation process for determining whether a claimant is disabled and entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. This Court's review necessarily incorporates a determination of whether the ALJ properly followed the five-step process prescribed by regulation. The steps may be briefly summarized as follows:

**Step One:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). If yes, the claimant is not disabled. If not, move to step two.

**Step Two:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. If the claimant has a severe impairment, move to step three.

**Step Three:** Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Pt. 404, subpt. P, app. 1, Pt. A. (Those Part A criteria are purposely set at a high level to identify clear cases of disability without further analysis). If so, the

claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**Step Four:** Determine whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past relevant work. *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If yes, the claimant is not disabled. If not, move to step five.

**Step Five:** At this point, the burden shifts to the Commissioner to demonstrate that the claimant, considering her age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

As to all legal issues, this Court conducts a plenary review. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). As to factual findings, this Court adheres to the ALJ's findings, as long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (internal quotation marks and citation omitted). Substantial evidence "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted).

When there is substantial evidence to support the ALJ's factual findings, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)); *Zirnsak*, 777 F.3d at 610-11 ("[W]e are mindful that we must not substitute our own judgment for that of the fact finder."). This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Commissioner's

4

decision, or it may remand the matter to the Commissioner for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 865-66 (3d Cir. 2007).

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five-step inquiry. *See Podedworny*, 745 F.2d at 221-22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000).

### B. The ALJ's Decision

The ALJ followed the five-step process in determining that Labrador was not disabled. The ALJ's findings may be summarized as follows:

**Step 1:** At step one, the ALJ determined that Labrador had not engaged in substantial gainful activity since October 24, 2014, the application date. (R. 20).

**Step 2:** At step two, the ALJ determined that Labrador had the following severe impairments: cervical and lumbar degenerative disc disease; right shoulder tendinopathy and labrum tear; and depression. (R. 20).

**Step 3:** At step three, the ALJ determined that Labrador did not have an impairment, or combination of impairments, that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Pt. 404, subpt. P., app. 1. (R. 21-23). There was no accepted medical source in the record that supported a finding that Labrador's impairments met or medically equaled any physical or mental impairment. (R. 21). "Although severe," the ALJ determined that the impairments "independently or in combination" did not meet the requirements set forth in Listing 1.00 for musculoskeletal impairments or Listing 12.00 for mental impairments. (*Id.*).

Regarding musculoskeletal impairments under Listing 1.00, the ALJ noted that Labrador was able to ambulate effectively and use his upper and lower extremities for fine and gross motor activities. (*Id.*).

5

Under Listing 12.00 for mental disorders, the ALJ concluded that Labrador's impairments did not cause at least two "marked" limitations, or one "extreme" limitation, under the Paragraph B criteria for mental functioning. (*Id.*). To satisfy the Paragraph B criteria, a claimant's mental disorder must result in an extreme limitation of one, or a marked limitation of two, of the four Paragraph B areas of mental functioning.

Of the four areas evaluated for mental functioning, the ALJ found that Labrador had no difficulty in two areas: (1) understanding, remembering, or applying information; or (2) adapting or managing himself. The ALJ further concluded that the record supported only a mild difficulty with interacting with others and a moderate difficulty with concentrating, persisting, or maintaining pace. (*Id.*).

**Step 4:** At step four, the ALJ determined that Labrador had the RFC to perform light work. (R. 23). The ALJ found that Labrador could "perform simple, routine, repetitive work," "lift and carry 10 pounds frequently and 20 pounds occasionally, sit for six hours," and "stand and/or walk six hours." (*Id.*). The ALJ also concluded that Labrador was capable of "pushing and pulling motions with his upper and lower extremities . . . with only occasional pushing and pulling with the right upper extremity." (*Id.*).

The ALJ also determined that Labrador did not have past relevant work, and that the record "lack[ed] earning at the substantial gainful activity level within the last 15 years." (R. 26).

**Step 5:** At step five, the ALJ considered Labrador's age, education, work experience and RFC in conjunction with the Medical-Vocational Guidelines. (R. 26). Relying on the testimony of the VE, the ALJ identified several representative jobs that Labrador could perform: (1) flagger (Director of Occupational Titles ("DOT") #372.667-022; (2) parking lot cashier (DOT #211.462-010); (3) toll collector (DOT #211.462-038); (4) document preparer (DOT #249.587-018); and (5) ticket checker (DOT #219.587-010). (R. 27). The

ALJ also determined, based on expert's testimony, that a significant number of these jobs were available nationally. (*Id.*).

Accordingly, the ALJ determined that Labrador was not under a disability, as defined in the Social Security Act, since October 24, 2014. (*Id.*).

## III.  Discussion

Labrador argues that the ALJ failed to consider "the evidence and effects" of his "combined severe impairments at Step 3." He challenges the RFC finding, essentially arguing that the ALJ failed to account for his low back pain and depression and his inability to engage in certain daily activities. Finally, he argues that the ALJ gave improper weight to the various medical opinions in the record.

### A. ALJ's Step 3 Analysis

Labrador dedicates one page in his brief to this argument. (PBr at 25-26). His argument, in full, is as follows:

> [T]he ALJ cites to the specific Listings for 1.00 Musculoskeletal System, 12.04 affective disorders and finds that the medical evidence failed to establish meeting the severity required by the listings. (R. 37.) The ALJ simply states that the evidence failed to establish documented signs, symptoms and/or laboratory findings indicating any impairment or combination of impairments were severe enough to meet the criteria of any listed impairment. (R. 37.) While the ALJ does provide a more detailed discussion regarding Listing 12.04, he still fails to discuss medical equivalence.

(PBr at 26). Record evidence does not establish that Labrador's impairments, considered singularly or in combination, meet the requirements of either listing.

At Step 3, the ALJ is required to analyze all of the impairments that were recognized as severe at Step Two. 20 C.F.R. § 404.1520(a)(4)(iii) (requiring that "[a]t the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled"). Step 3 of the analysis provides that "when . . . an

7

individual's impairment . . . meets or equals the level of severity described in the Listing, and also meets the durational requirement, disability will be found on the basis of the medical facts alone in the absence of evidence to the contrary." Social Security Ruling 86-8, 1986 SSR LEXIS 15 (hereinafter "SSR 86-8").

The Listings describe impairments the SSA considers per se "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a). A claimant must show that his or her impairments, considered alone or in combination, "meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891, 107 L. Ed. 2d 967 (1990).

To meet this standard, "the set of symptoms, signs and laboratory findings in the medical evidence supporting a claim must be compared with, and found to be equivalent in terms of medical severity and duration to, the set of symptoms, signs and laboratory findings specified in the listed impairment." SSR 86-8. If a claimant's "impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds" to Step 4 and 5, *Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), at which point the Commissioner "must determine whether the claimant retains the ability to perform either his former work or some less demanding employment." *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S. Ct. 1952, 1953, 76 L. Ed. 2d 66 (1983).

### 1.    *Listing 1.00 - Musculoskeletal Impairment*

To demonstrate a degree of functional loss to meet or equal the musculoskeletal listing (Listing 1.00), a plaintiff must show that his or her impairments render him or her unable to effectively ambulate and to perform fine and gross movements on a sustained basis. 20 C.F.R. Part 404, Subpart P, App. 1, Listing 1.00(B)(2)(a). "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be

8

able to carry out activities of daily living." 20 C.F.R. Part 404, Subpart P, App. 1, Listing 1.00(B)(2)(b)(2). Examples of ineffective ambulation include the following:

> the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. Part 404, Subpart P, App. 1, Listing 1.00(B)(2)(b)(2).

An "[i]nability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Part 404, Subpart P, App. 1, Listing 1.00(B)(2)(c). Examples of ineffective fine and gross movements include "the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." 20 C.F.R. Part 404, Subpart P, App. 1, Listing 1.00(B)(2)(c).

In reaching his decision on Labrador's application, the ALJ noted at the outset that "no accepted medical source of record has opined that the claimant's impairments meet or medically equal any physical or mental impairment." (R. 21). Two state agency physicians, James Paolino, M.D., and Toros Shahinian, M.D., reviewed Labrador's claim in December 2014 and May 2015, respectively, and determined that he did not have a severe medical impairment. (R. 66, 74).

In terms of Listing 1.00, the ALJ concluded that Labrador can ambulate effectively and use his upper and lower extremities for fine and gross motor activities. (*Id.*). The function reports revealed that Labrador is able "to take care of his personal needs, prepare simple meals, do light chores, such as sweeping, handle finances, shop, socialize with family, attend public venues such as stores and church, use public transportation and follow instructions." (R. 21-

9

22, 26, 230-33). Although Spanish was Labrador's first language, he could speak, understand, and read English. (R. 22). The record also revealed that Labrador could ambulate effectively and walk without the assistance of any walking device. (R. 40, 231, 291). To the extent Labrador contends otherwise (PBr at 33 (citing R. 244, Disability Appeal Form)), it is not supported by medical evidence in the record.

In connection with a previous Social Security disability claim (R. 204), Labrador had a consultative orthopedic examination with Justin Fernando, M.D., in March 2013, before the alleged onset date in October of 2013. (R. 290-94). Dr. Fernando diagnosed chronic lower back pain with bilateral subjective symptoms of radiculopathy. (R. 291). On examination, Labrador's gait was normal, he had no restrictions on mobility, and he was able to walk heel to toe without difficulty (R. 291). Additionally, "[a]ll the joints of the upper extremities, shoulders, elbows, forearms, wrists, and fingers . . . [were] capable of reaching full ranges of motion, with no indication of any painful restriction of mobility." (*Id.*). Strength in Labrador's upper extremities was noted as "5/5." (*Id.*).

At a January 21, 2015 examination, Labrador had normal musculoskeletal findings and normal range of neck motion. (R. 353). A May 21, 2015 MRI of Labrador's right shoulder revealed a tear of the superior labrum with degeneration of biceps anchor, capsular thickening, and AC joint hypertrophy with no rotator cuff tear. (R. 358).

In February 2016, orthopedist Michael Lu, M.D., diagnosed Labrador as having right biceps tendinitis and prescribed physical therapy for his shoulder (R. 370-71). At his initial therapy evaluation, Labrador described his right shoulder pain as aching and sharp, but intermittent. (R. 375-76). In June 2016, Labrador reported that he could take care of his personal hygiene, could lift light weights, and was able to engage in most, but not all, recreational activities because of the pain in his neck. (R. 589-90). During a June 2016 emergency room visit for poison ivy, Labrador's physical examination findings revealed normal mobility. (R. 506, 514).

An MRI from June 2016 showed the presence of early degeneration, marked tendinopathy, and degenerative labrum tearing. (R. 385). Labrador continued physical therapy and therapy records in August 2016 documented decreased pain. (R. 601). Labrador requested to be discharge from therapy. (R. 601).

Labrador has not established that he was unable to ambulate effectively or perform fine and gross movements as required under this Listing. There was no evidence that he used a walking device. Moreover, he was able to carry out routine ambulatory activities, such as using standard public transportation, going shopping, and attending church. In terms of fine and gross movements, the record reveals that he can prepare simple meals, take care of his hygiene, and do light chores. Accordingly, Labrador did not meet either of the two required criteria under Listing 1.00, and the ALJ's findings are supported by substantial evidence in the record.

## 2. *Listing 12.04 - Mental Impairment*

In order to meet the criteria of Listing 12.04 for depression, a claimant must establish an extreme limitation of one, or a marked limitation of two, of the four areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. 404, Subpart P, Appendix 1, Listing 12.04(B). These impairment-related functional limitations are incompatible with the ability to do any gainful activity. *Id.* A limitation is extreme if "[y]ou are not able to function in this area independently, appropriately, effectively, and on a sustained basis;" and "marked" if "[y]our functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. 404, Subpart P, Appendix 1, §12.00(F)(2).

Here, the ALJ found that Labrador had no difficulty in two areas: (1) understanding, remembering, or applying information; or (2) adapting or managing himself. (R. 21). Understanding, remembering, or applying "refers to the abilities to learn, recall, and use information to perform work activities." 20

C.F.R. 404, Subpart P, Appendix 1, §12.00(E)(1).[2] Adapting or managing oneself "refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. 404, Subpart P, Appendix 1, §12.00(E)(4).[3]

   The ALJ further concluded that the record supported only a mild difficulty with interacting with others and a moderate difficulty with concentrating, persisting or maintaining pace. Interacting with others "refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. 404, Subpart P, Appendix 1, §12.00(E)(2). Concentrating, persisting, or maintaining pace "refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. 404, Subpart P, Appendix 1, §12.00(E)(3).[4]

---

[2]   Examples of understanding, remembering, or applying information include these:

   understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.

20 C.F.R. 404, Subpart P, Appendix 1, §12.00(E)(1).

[3]   Examples of adapting or managing oneself include these:

   responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

20 C.F.R. 404, Subpart P, Appendix 1, §12.00(E)(4).

[4]   Examples of concentrating, persisting, or maintaining pace include these:

   initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an

The ALJ noted at the outset that Labrador had a conservative mental health treatment history since filing the application, that Labrador had normal clinical findings from a mental status exam, and that there was no medical opinion evidence establishing a greater degree of limitation. (R. 21). In addition to reviewing activities of daily living as noted above, the ALJ went through the medical evidence in the record. (R. 22-23).

On October 11, 2013, Labrador reported depression to Dr. Arthur Badillo, M.D., and was prescribed Xanax. (R. 494). Labrador's treating psychiatrist, Gita Parikh, M.D., diagnosed Labrador as having major depression with psychosis. (R. 22, 448). On July 15, 2015, Dr. Parikh prescribed Cymbalta, Seroquel, and Xanax. (R. 448). Labrador's symptoms stabilized with medication. (R. 22).

In August of 2015, Labrador reported that he was compliant with his medications and was doing well, felt calm, and was able to sleep. (R. 439). He felt less depressed and paranoid. (*Id.*). He reported that he was doing "okay" and felt less depressed in September of 2015. (R. 437). In October of 2015, he reported that the medications helped, that he felt less depressed, but that he sometimes heard voices. (R. 434).

On January 27, 2016, Labrador reported "doing better than before," being less depressed, and hearing voices less often. (R. 429). On April 15, 2016 and on June 17, 2016, Labrador reported that he was doing well on his current medications. (R. 423, 426).

On June 21, 2016, Labrador met with an RN, and indicated that he had been taking medication for several months, still heard voices randomly but did not appear psychotic. (R. 421). Additionally, he reported that he had "very bad"

---

ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

20 C.F.R. 404, Subpart P, Appendix 1, §12.00(E)(2).

depression before, but now had a good relationship with his ex-wives and was spending time with his daughters. (*Id.*).

In mid-August 2016, Labrador reported that his medications helped him relax and feel less depressed. (R. 413). He denied hallucinations, paranoid ideation, or agitation. (*Id.*). He spent time with his family regularly and took "care of his physical self." (R. 411). In November of 2016, Labrador similarly reported doing well, and denied hallucinations, paranoid ideations, or agitation. (R. 403). He indicated that he was sleeping well. (*Id.*).

In December of 2016, Labrador stated that he was doing well and took his medications when he "need[ed] it." (R. 398). He was advised to take his medication as prescribed. (*Id.*). In January of 2017, Labrador missed an appointment and ran out of medication. (R. 392). He reported feeling depressed and paranoid, and hearing voices. (*Id.*).

In early February of 2017, Labrador reported that he missed his group therapy the prior month because he had the chance to work. (R. 390). He denied anxiety and depression and indicated that he would comply with appointments and medication. (*Id.*). In late February 2017, Labrador reported that he was less depressed with medication and lived with a supportive sister. (R. 386). He was sleeping well, and again denied paranoia and hallucinations. (*Id.*). Dr. Parikh noted that he was stable with his current treatment. (*Id.*).

In April 2017, Dr. Parikh completed a mental medical source statement regarding Labrador's mental functional abilities. (R. 602-04). The report noted that Labrador began treatment in July 2015 and was seen once a month for medication management and group therapy. (R. 602). Dr. Parikh reported that Labrador was depressed due to physical pain and inability to work due to pain, and that he denied suicidal or homicidal ideation. (R. 603). She also opined that Labrador did not have any restrictions in daily living, and moderate limitations in social functioning and concentration. (R. 604). Dr. Parikh opined that Labrador would have difficulty working at a regular job on a sustained basis and he would be absent from work more than three times a month. (*Id.*).

Based on this medical documentation, the ALJ articulated a well-reasoned decision explaining why Labrador's depression did not meet or medically equal Listing 12.04. Both state agency physicians opined that Labrador did not meet or medically equal a listing. The ALJ gave great weight to Dr. Parikh's opinion that Labrador had "no more than moderate limitations." (R. 22). The examinations consistently documented "cooperative behavior, stable mood, appropriate affect and intact thought process." (*Id.*).

The ALJ ascribed little weight to Dr. Parikh's opinion that Labrador would be absent from work more than three times per month because that portion of the opinion was not supported with evidence. (R. 22-23); *see* 20 C.F.R. § 416.927(c)(2) (providing that controlling weight can be given to "a treating source's medical opinion" *if* the medical opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."). Additionally, the record did not reveal many missed appointments, problems leaving home, or conversing with others. (R. 22).

The evidence in the record does not support a finding of either an extreme or marked limitation of any of the areas of mental functioning. The claimant has "the burden of presenting sufficient evidence that her medical problems were of listing severity." *Williams v. Comm'r of Soc. Sec.*, 156 F. App'x 501, 505 (3d Cir. 2005) ("The burden imposed on a claimant at step three is a far more exacting standard than step two's threshold (used to prevent frivolous claims), which requires that a claimant show that she suffers from a 'severe' impairment."). I do not see any error in the ALJ's review of the medical records, and Labrador does not specifically point one out. (PBr at 25-26). Accordingly, I reject Labrador's argument on this point.

### B. ALJ's RFC Analysis[5]

Labrador argues that the ALJ failed to consider his "ongoing, severe chronic low back pain and depression" in determining his RFC. (PBr at 28). Additionally, Labrador points out that in his Disability Appeal, he communicated more severe limitations in his daily activities than those he related in the Function Reports. (PBr at 32-33).[6] Labrador also challenges the weight the ALJ gave to the opinions of Dr. Parikh, Dr. Badillo, and Dr. Fernando. (PBr at 30-31, 33-35).

#### 1. *Severity of Back Pain and Depression*

RFC is an assessment of the most a claimant can do despite his or her impairments. 20 C.F.R. § 404.1545. To determine a claimant's RFC, an ALJ must engage in a two-step process: first, consider all of a claimant's symptoms that can reasonably be accepted as consistent with the objective medical evidence, and second, determine how those symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529.

In evaluating a claimant's symptoms for RFC purposes, the ALJ must "consider all [of the claimant's] symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a). However, a claimant's statements about his or her

> pain or other symptoms will not alone establish that [the claimant is] disabled; there must be medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant] is disabled. In evaluating the intensity and persistence of [the

---

[5]    Due to an overlap of issues, this section of the Opinion addresses Labrador's arguments in section (B) and (C) of his brief.

[6]    This argument essentially points out the inconsistencies in Labrador's self-reporting as to his daily activities, and places his credibility in doubt.

16

claimant's] symptoms, including pain, [the ALJ must] consider all
of the available evidence, including [the claimant's] medical
history, the medical signs and laboratory findings and statements
about how [the claimant's] symptoms affect [him or her].

*Id.* (alteration added); *see Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999)
(rejecting claimant's argument that ALJ failed to consider subjective symptoms
when ALJ found that subjective symptoms were inconsistent with objective
medical evidence and claimant's hearing testimony).

Once an underlying impairment has been shown, the ALJ must next
evaluate the intensity and persistence of the claimant's symptoms to determine
how they limit a claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). In
evaluating the intensity and persistence of those symptoms, an ALJ should
consider all of the available evidence, including the claimant's medical history,
the medical signs and laboratory findings, statements from the claimant, and
his or her treating or non-treating source, or statements from other persons.
*Id.*

When a claimant's alleged symptoms suggest a greater level of
impairment than can be supported by the objective medical evidence alone, an
ALJ should consider the following factors to assess the credibility of a
claimant's statements: (i) the extent of the claimant's daily activities; (ii) the
location, duration, frequency, and intensity of the symptoms; (iii) precipitating
and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of
any medication; (v) treatment other than medication for the symptoms; (vi)
measures used to relieve pain or other symptoms; and (vii) other factors
concerning functional limitations and restrictions due to pain or other
symptoms. 20 C.F.R. § 404.1529(c)(3).

The ALJ must consider all relevant evidence, including subjective
complaints, in determining the RFC. *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d
Cir. 2001) (citing 20 C.F.R. § 404.1545(a)). However, the claimant retains the
burden of supporting his or her alleged RFC limitations. *Bowen v. Yuckert*, 482
U.S. 137, 146 (1987); *see also* 20 C.F.R. § 404.1545(a) ("In general, you [the

plaintiff] are responsible for providing the evidence we will use to make a finding about your residual functional capacity."). An ALJ may reject, or only partially credit, subjective complaints if they are not credible in light of the other evidence of record. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999). Nonetheless, the ALJ's credibility determination "must contain specific reasons for the finding of credibility, supported by the evidence in the case record." *See* 20 C.F.R. §§ 404.1529(b), 416.929(b).

In this case, the ALJ correctly engaged in the two-step process in evaluating Labrador's subjective complaints and properly articulated specific credibility findings, which were supported by the evidence in the record. The ALJ determined that Labrador had a medically determinable impairment that could reasonably be expected to cause the alleged symptoms. However, the ALJ also found that his statements concerning the intensity, persistence, and limiting effects of those symptoms were not fully credible in light of the objective medical and other evidence in the record.

The ALJ first explained that the consultative orthopedic examination with Dr. Fernando in 2013, before the alleged onset date, was normal. (R. 24, 290-92). After the alleged onset date, Labrador's pain was treated with medication and physical therapy, which Labrador eventually discontinued. (R. 24, 375, 398, 590, 601).

Importantly, both State agency consultants opined that Labrador's impairments were not severe. (R. 25). In January 2015, on examination, Labrador had normal musculoskeletal findings and normal neck motion. (R. 25, 353). Imaging from April of 2015 of Labrador's right shoulder was unremarkable. (R. 465).

In February 2016, after having diagnosed right biceps tendinitis, Dr. Michael Lu prescribed physical therapy. (R. 25, 370-71). After an MRI,

continued physical therapy was prescribed and records revealed a decrease in pain.[7]

In June 2016, Labrador reported that he was able to engage in self-care and most, but not all, recreational activities because of the pain in his neck. (R. 590). In June of 2016, after five sessions, Labrador requested to be discharged from therapy. (R. 601). At that time, his pain had decreased, and he had good endurance, coordination, and balance. (*Id.*). In December 2016, Labrador told his mental health provider that with medication, he had "no shoulder pain," and that he did not require a shoulder injection. (R. 398).

The ALJ noted that prescription records revealed stable medication treatment, without increased dosages or frequent adjustments. (R. 25). The record did not contain any evidence that Labrador's providers recommended injection treatments, narcotic medications, or surgical evaluation for intractable pain. (R. 25). In sum, the clinical findings were generally good other than limited right shoulder motion. (R. 25, 353, 514).

---

[7]     Labrador also argues that the "ALJ erroneously states that the record did not document any lumbar or cervical diagnostic tests performed after the alleged onset date of October 25, 2013. (R. 24.) Plaintiff did in fact undergo an MRI/CT scan on January 12, 2016 which showed disc herniations." (R. 29). Labrador cites an indiscernible handwritten note from Dr. Badillo. (R. 475). That note seems to mention an "MRI/CT" and "disc herniated" or "disc herniation." (R. 475). There is apparently no corresponding MRI study or CT scan in the record. (DBr at 12).

The law does not require an ALJ to cite to every piece of evidence in an opinion. *See Pintal v. Comm'r of Soc. Sec.*, 602 F. App'x 84, 88 (3d Cir. 2015) ("an ALJ is not required to cite every piece of evidence in the record."). If that were the case, each ALJ opinion would have to reproduce the medical record itself, a requirement both impractical and futile. In any event, any error in omitting this reference was harmless.

It is difficult to interpret the note, which is not supported with imaging. It is unclear whether this note meant that Labrador had an MRI done, or whether he should get an MRI done. The ALJ recognized that Labrador had degenerative disc disease that resulted in ongoing back pain. Despite this back pain, the objective medical evidence in the record, the extent of Labrador's daily activities and treatment history and measures did not support a finding that he was as limited as he alleged. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (recognizing that Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

The ALJ ultimately concluded that Labrador was able to perform a reduced range of light work, given Labrador's limited prescribed treatment and giving great deference to his complaints. (R. 26). The objective medical evidence supports this conclusion.

### 2. *Weight Given to Medical Opinions*

Without citation to any evidence in the record, Labrador argues that the ALJ should have found that he would have difficulty staying on task and maintaining a work schedule. (PBr at 30). Labrador also argues that the ALJ should have given more weight to Dr. Parikh's opinion that Labrador would have difficulty working a regular job and would be absent from work more than three times a month. (*Id.*). Labrador also argues, somewhat conclusory and without much elaboration, that "the ALJ should have given more weight to the opinions of Dr. Badillo." (PBr at 31).

Under 20 C.F.R. § 416.927(c), ALJs are required to weigh and evaluate "every medical opinion." Medical opinions are defined as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

20 C.F.R. § 404.1502 lists the "acceptable medical sources" that can provide evidence to establish an impairment. "Treating source means [an] acceptable medical source who provides [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 416.927(a)(2) (alterations added). Controlling weight can be given to "a treating source's medical opinion on the issue(s) of the nature and severity" of the claimant's impairments if the medical opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c)(2).

"[A] reviewing court should not re-weigh the medical opinions of record but should consider only whether the ALJ's weighing of such opinions was

supported by substantial evidence." *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 880 (3d Cir. 2005) (citing *Monsour Med. Ctr. v. Heckler*, 806 F.3d 1185, 1190 (3d Cir. 1986)). "The ALJ — not treating or examining physicians or State agency consultants — must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c)).

When an ALJ totally rejects a medical opinion, he or she is required to point to "contradictory medical evidence." *Cunningham v. Comm'r of Soc. Sec.*, 507 Fed. App'x 111, 118 (3d Cir. 2012). Where, as here, the ALJ is discounting, rather than rejecting, opinion evidence, he or she must "consider all the evidence and give some reason for discounting the evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).

The ALJ gave great weight to Dr. Parikh's opinion that Labrador had no more than moderate limitations in the areas of mental functioning, such as concentration and social functioning. (R. 22). However, the ALJ ascribed little weight to Dr. Parikh's opinion that Labrador would be absent from work more than three times per month because that portion of the opinion was not supported with evidence. (R. 22-23); *see* 20 C.F.R. § 416.927(c)(2) (providing that controlling weight can be given to "a treating source's medical opinion" if the medical opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."). Labrador's examinations consistently documented cooperative behavior, stable mood, appropriate affect, and intact thought processes. (R. 22, 386-460). The ALJ explained that Dr. Parikh's opinion regarding Labrador's absences was not supported by evidence. Under the substantial evidence standard of review, that is sufficient justification to discount a medical opinion.

Turning to Dr. Badillo, the ALJ noted that Labrador saw Dr. Badillo both before and after the alleged onset. Dr. Badillo "checked a box" that Labrador was unable to work. *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)

("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best. . . . [W]here these so-called reports are unaccompanied by thorough written reports, their reliability is suspect."). The ALJ ascribed "little weight" to this portion of Dr. Badillo's opinion because "he did not provide any supportive findings." And while Dr. Badillo also opined that Labrador had limitations in lifting, bending, stooping, and climbing, he failed to provide specific limitations. The ALJ was not required to adopt this portion of Dr. Badillo's opinion, which lacked clinical or evidentiary support.

Finally, Dr. Fernando treated Labrador before the alleged disability onset date and rendered an opinion in connection with Labrador's prior disability claim. "For historical purposes," the ALJ noted that Labrador had been seen by Dr. Fernando in 2013, and that the findings were essentially unremarkable. (R. 24). Labrador does not point to anything that requires the ALJ to ascribe weight to a medical report that issued before the alleged onset date. *See Sommerfeld v. Astrue*, No. CV-10-299-JPH, 2011 U.S. Dist. LEXIS 146322, at *13 (E.D. Wash. Dec. 9, 2011) ("Because this evidence related to a period of time before alleged onset, the Commissioner is correct that it was not probative and the ALJ was not required to discuss it."); *see also Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir. 1981) (noting that ALJ is not required to discuss all evidence; rather, she must explain why significant probative evidence has been rejected).

I see no error in the ALJ's analysis or reasoning and I will not re-weigh the medical opinions in the record. There was contradictory evidence in the record. The ALJ gave great weight to the State agency opinions that concluded that Labrador was not disabled. There is no facial error in an ALJ's reliance on "highly qualified . . . experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); *see also Chandler*, 667 F.3d at 361 ("[S]tate agency opinions merit significant consideration.").

Moreover, the ALJ explained why the contradictory treating opinions were not given controlling weight. That reasoning was in accord with the

regulatory guidance that requires the ALJ to consider every medical opinion and explain his or her reasoning in accepting or rejecting an opinion.[8]

## IV. Conclusion

For the foregoing reasons, the ALJ's decision is affirmed. An appropriate order accompanies this Opinion.

Dated: June 26, 2019

KEVIN MCNULTY
United States District Judge

---

[8]     Labrador notes that his attorney requested a psychological consultative examination prior to the administrative hearing to determine learning disabilities and intellectual delays, but that the ALJ did not order one. (PBr at 29). An ALJ "may purchase a consultative examination to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on your claim." 20 C.F.R. § 416.919a(b); see 20 C.F.R. § 416.917 (providing that ALJ may, but is not required to, order a consultative examination "[i]f your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled."). Labrador, in making this argument, does not point to an insufficiency of evidence. The record contains voluminous treatment notes from numerous treating sources, including his treating psychiatrist, who noted that Labrador did not have a low IQ or reduced intellectual functioning (R. 604).